# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF IOWA
### WESTERN DIVISION

THE CONVEYOR COMPANY,

    Plaintiff,

vs.

SUNSOURCE TECHNOLOGY
SERVICES, INC.,

    Defendant.

No. C 03-4092-MWB

**MEMORANDUM OPINION AND
ORDER REGARDING
DEFENDANT'S MOTION FOR
PARTIAL SUMMARY JUDGMENT**

---

## TABLE OF CONTENTS

I. INTRODUCTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   A. Procedural Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2
   B. Factual Background . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 4

II. LEGAL ANALYSIS . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 6
   A. Standards For Summary Judgment . . . . . . . . . . . . . . . . . . . . . 6
   B. The Merchantability Claim . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      1. The claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 8
      2. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . 8
      3. Applicable law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 10
      4. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 13
         a. "Merchantability" under § 554.3214(2)(a) . . . . . . . 13
         b. "Merchantability" under § 554.3214(2)(c) . . . . . . . 15
   C. The Strict Liability Claim . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      1. The claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21
      2. Arguments of the parties . . . . . . . . . . . . . . . . . . . . . . . . 21
      3. Applicable law . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23
      4. Analysis . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 27
   D. The Negligent Misrepresentation Claim . . . . . . . . . . . . . . . . . 32
      1. The claim . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

|     | 2.  | *Arguments of the parties* | . . . . . . . . . . . . . . . . . . . . . . | 33 |
|     | 3.  | *The "economic loss" bar* | . . . . . . . . . . . . . . . . . . . . . . | 34 |
|     | 4.  | *The elements of the claim* | . . . . . . . . . . . . . . . . . . . . . | 35 |
|     |     | a. *Definition of the necessary duty* | . . . . . . . . . . . . . . | 36 |
|     |     | b. *Did SunSource have the necessary duty?* | . . . . . . . . | 40 |

*III.* **CONCLUSION** . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

W‌hat claims can the manufacturer of a stinger stacker, used for unloading certain raw materials from a ship to ground stock piles, maintain against the supplier of the hydraulic lift package identified as the source of the collapse of the stinger stacker? Here, the supplier of the hydraulic lift package has moved for summary judgment on the manufacturer's claims of breach of implied warranty of merchantability, strict products liability, and negligent misrepresentation. The supplier's motion requires the court to consider matters as diverse as the fine distinctions between a claim of breach of warranty for a *particular* purpose and a claim for breach of warranty for *ordinary* purposes (merchantability), and the impact of Iowa's "economic loss rule" on tort claims.

## I.  INTRODUCTION

### A.  Procedural Background

Plaintiff The Conveyor Company (Conveyor), an Iowa corporation with its principal place of business in Sibley, Iowa, filed its Complaint in this diversity action on September 25, 2003, against defendant SunSource Technology Services, Inc. (SunSource), a Delaware

corporation. Conveyor alleges several claims arising from the collapse of a "Rail-Mounted Stinger Stacker with Rail-Mounted Tripper" (the Stinger Stacker) built by Conveyor, for which SunSource had provided the hydraulic lift package. Conveyor sold the Stinger Stacker to non-party Martin Marietta Aggregates. Shortly thereafter, the Stinger Stacker collapsed while in use, causing damages to the Stinger Stacker itself, but no injuries or other property damage. In Count I of its Complaint, Conveyor alleges breach of implied warranty of fitness for a particular purpose; in Count II, breach of implied warranty of merchantability; in Count III, strict products liability; in Count IV, negligent misrepresentation; and in Count V, breach of contract. *See* Docket No. 1. SunSource answered Conveyor's Complaint on October 27, 2003 (docket no. 8), denying all of Conveyor's claims. Trial in this matter is currently set for December 12, 2005.

On August 10, 2005, SunSource filed a Motion For Partial Summary Judgment (docket no. 47), seeking summary judgment in its favor on Counts II, III, and IV of Conveyor's Complaint. Conveyor resisted that motion on September 6, 2005 (docket no. 48), and SunSource filed a reply in further support of its motion for partial summary judgment on September 16, 2005 (docket no. 51). At SunSource's request, the court set oral arguments on SunSource's motion for partial summary judgment for October 21, 2005. At the oral arguments, plaintiff Conveyor was represented by Edward F. Pohren of Dwyer, Smith, Gardner, Lazer, Pohren, Rogers & Forrest, L.L.P., in Omaha, Nebraska. Defendant SunSource was represented by Stephen J. Holtman of Simmons, Perrine, Albright & Ellwood, P.L.C., in Cedar Rapids, Iowa, who argued the merchantability issues concerning Count I, and by David H. Bamberger of DLA Piper Rudnick Gray Cary US L.L.P., in Washington, D.C., who argued the tort claim issues concerning Counts II and III. SunSource's motion for partial summary judgment is now fully submitted.

### B. Factual Background

The court will not attempt here a complete dissertation of the undisputed and disputed facts in this case. Rather, the court will provide sufficient of the facts, undisputed and disputed, to put in context the parties' arguments for and against summary judgment on Counts II, III, and IV of Conveyor's Complaint. Indeed, the court finds that the facts pertinent to SunSource's motion for partial summary judgment are considerably less extensive than the parties assert, because many of the issues raised in that motion are questions of law concerning the viability of certain claims, where the *pertinent* facts are undisputed.

In late 2000, Conveyor contracted to supply Martin Marietta Aggregates with a "Rail-Mounted Stinger Stacker with Rail-Mounted Tripper" for use at Martin Marietta Aggregate's Savannah, Georgia, Marine Terminal. The Stinger Stacker for Martin Marietta Aggregates was 48" by 170', and was mounted on rails. Such a "stacker" moves product, in this case, aggregate, up a conveyor belt and deposits the product in stock piles. A "stinger" is an extendible conveyor on a stacker used, in this case, to unload aggregate from ships to ground stock piles. The Stacker in question here raised the Stinger by means of a dual hydraulic cylinder system. The parties agree that the extension of the two cylinders to raise the Stinger had to be synchronized, so that both cylinders would lift or lower the Stinger the same distance.

Because Conveyor did not have sufficient expertise with hydraulic systems, Conveyor sought bids from two hydraulics vendors for the hydraulic lift package for the Stinger Stacker. One of the bidders was SunSource. Conveyor provided the vendors with information needed to generate a quotation, although the parties dispute details of what was disclosed about Conveyor's design for the Stinger Stacker, either then or later. The parties agree that SunSource was eventually selected as the successful bidder and that SunSource

ultimately designed and provided the hydraulic lift package for the Stinger Stacker for Martin Marietta Aggregates.

SunSource's quotation for the hydraulic lift package, submitted in June 2001, was apparently based on the assumption that there would be a mechanical linkage between the two hydraulic cylinders in the lift package, as shown in the initial design specifications provided by Conveyor; consequently, SunSource did not include in its original design of the hydraulic lift package a "flow divider" to divide and regulate the flow of hydraulic fluid between the two cylinders. However, after the second of only two meetings between representatives of Conveyor and SunSource, this one in late June of 2001, Conveyor requested and SunSource provided a quotation including a flow divider that would provide equal flow of hydraulic fluid (50/50) to the two cylinders. Specifically, SunSource quoted a "50/50" Sterling Flow Divider. Conveyor contends that the "geometry" of the Stinger Stacker did not permit the mechanical linkage of the two hydraulic cylinders, so that the flow divider was the only means of insuring the synchronization of the cylinders. One key "fighting issue" between the parties in this litigation is whether Conveyor ever disclosed to SunSource that there would be no mechanical linkage between the hydraulic cylinders, so that the flow divider would be the only part of the Stinger Stacker that would synchronize the cylinders. Another key "fighting issue" is whether SunSource ever disclosed to Conveyor that the Sterling Flow Divider that SunSource proposed to incorporate into the hydraulic lift package had as much as a 10% variance in flow between the cylinders. The parties do not dispute that more accurate flow dividers, which could have synchronized the extension of the two cylinders to within millimeters of each other, were available and known to SunSource.

SunSource eventually delivered the hydraulic lift package for the Stinger Stacker to Conveyor in the summer of 2001, and Conveyor incorporated it into the Stinger Stacker.

Conveyor then delivered the Stinger Stacker to Martin Marietta Aggregates in January 2002. On or about January 16, 2002, the Stinger Stacker totally collapsed while it was in operation, apparently for testing purposes. Conveyor's experts have opined that the differential elongation of the hydraulic rams caused the truss on which the conveyor was mounted to fail, and that the differential elongation, in turn, was caused by the unequal distribution of hydraulic fluid to the two hydraulic rams by the flow divider. Consequently, Conveyor attributes the collapse to a flawed design by SunSource.

At the time of the collapse, the falling Stinger Stacker narrowly missed two people standing on the ground. However, no one was injured during the collapse and no other property, besides the Stinger Stacker, was damaged. Conveyor has not alleged any damages other than pecuniary losses, primarily in the form of costs for replacement parts and rental of substitute equipment, related to the failure of the Stinger Stacker.

## II. LEGAL ANALYSIS

### A. Standards For Summary Judgment

Rule 56 of the Federal Rules of Civil Procedure provides that a defending party may move, at any time, for summary judgment in that party's favor "as to all or any part" of the claims against that party. FED. R. CIV. P. 56(b). "The judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law." FED. R. CIV. P. 56(c). As this court has explained on a number of occasions, applying the standards of Rule 56, the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial. *Quick v. Donaldson Co.*, 90 F.3d

1372, 1376-77 (8th Cir. 1996); *Johnson v. Enron Corp.*, 906 F.2d 1234, 1237 (8th Cir. 1990). In reviewing the record, the court must view all the facts in the light most favorable to the nonmoving party and give that party the benefit of all reasonable inferences that can be drawn from the facts. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 587 (1986); *Quick*, 90 F.3d at 1377 (same).

Procedurally, the moving party bears "the initial responsibility of informing the district court of the basis for its motion and identifying those portions of the record which show lack of a genuine issue." *Hartnagel v. Norman*, 953 F.2d 394, 395 (8th Cir. 1992) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)); *see also Rose-Maston v. NME Hosps., Inc.*, 133 F.3d 1104, 1107 (8th Cir. 1998); *Reed v. Woodruff County, Ark.*, 7 F.3d 808, 810 (8th Cir. 1993). When a moving party has carried its burden under Rule 56(c), the party opposing summary judgment is required under Rule 56(e) to go beyond the pleadings, and by affidavits, or by the "depositions, answers to interrogatories, and admissions on file," designate "specific facts showing that there is a genuine issue for trial." FED. R. CIV. P. 56(e); *Celotex*, 477 U.S. at 324; *Rabushka ex. rel. United States v. Crane Co.*, 122 F.3d 559, 562 (8th Cir. 1997), *cert. denied*, 523 U.S. 1040 (1998); *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 511 (8th Cir. 1995); *Beyerbach v. Sears*, 49 F.3d 1324, 1325 (8th Cir. 1995). An issue of material fact is "genuine" if it has a real basis in the record. *Hartnagel*, 953 F.2d at 394 (citing *Matsushita Elec. Indus. Co.*, 475 U.S. at 586-87). "Only disputes over facts that might affect the outcome of the suit under the governing law will properly preclude the entry of summary judgment," *i.e.*, are "material." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Beyerbach*, 49 F.3d at 1326; *Hartnagel,* 953 F.2d at 394.

If a party fails to make a sufficient showing of an essential element of a claim with respect to which that party has the burden of proof, then the opposing party is "entitled to

judgment as a matter of law." *Celotex Corp.*, 477 U.S. at 323; *In re Temporomandibular Joint (TMJ) Implants Prod. Liab. Litig.*, 113 F.3d 1484, 1492 (8th Cir. 1997). Ultimately, the necessary proof that the nonmoving party must produce is not precisely measurable, but the evidence must be "such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Allison v. Flexway Trucking, Inc.*, 28 F.3d 64, 66 (8th Cir. 1994).

The court will apply these standards to SunSource's motion for partial summary judgment on Counts II, III, and IV of Conveyor's Complaint.

## B. The Merchantability Claim

### 1. The claim

The first claim on which SunSource has moved for summary judgment is Conveyor's claim of breach of implied warranty of merchantability in Count II of Conveyor's Complaint. In that Count, Conveyor alleges, in essence, that Sunsource "breached its implied warranty of merchantability in that the hydraulic lift package was not suitable for use to lift both hydraulic lifts simultaneously to the same height," and that Conveyor suffered "general damages" of $560,400 as the result of that breach. Complaint, Count II, ¶¶ 23 & 25. Conveyor alleges, further, that it suffered "consequential damages in the form of loss [of] profits and loss of good will, as well as incidental damages including sums expended by Plaintiff to investigate the collapse of the Stacker." *Id.* at 26.

### 2. Arguments of the parties

SunSource contends that Conveyor cannot prevail on its merchantability claim as a matter of law, because Conveyor cannot generate a genuine issue of material fact that the goods in question were not "merchantable." This is so, SunSource argues, because it is

clear from the face of Conveyor's Complaint that Conveyor is not complaining about "merchantability," meaning *fitness for ordinary purposes,* but about failure of the hydraulic lift package to be *fit for Conveyor's particular purposes*. SunSource also argues that Conveyor has no evidence that the hydraulic lift package was not *fit for the ordinary purposes* of a hydraulic lift package, as required for a viable "merchantability" claim. More specifically, SunSource contends that there is no evidence that the hydraulic lift package was not what it purported to be or that the flow divider it contained did not perform with a 50/50 ratio within 10% variance. SunSource contends that Conveyor only asserts, and has only identified evidence showing, that the flow divider was insufficient for Conveyor's *particular* purposes. Still more specifically, SunSource argues that there is no expert evidence that the hydraulic lift package as a whole, or the flow divider in it, was not fit for *ordinary* purposes, only expert evidence that they were inappropriate for Conveyor's particular purposes, which SunSource contends Conveyor had not fully disclosed to SunSource.

In response, Conveyor contends that the hydraulic lift package designed and provided by SunSource was not "merchantable," because it was not fit for the ordinary purposes for which such goods are used, and it would have failed to pass without objection in the trade under the contract description. More specifically, Conveyor contends that a "merchantable" hydraulic system with dual cylinders should raise and lower the lift arms equally. Conveyor points to expert testimony, including testimony by SunSource's expert, that the hydraulic lift package in the Stinger Stacker failed, causing the collapse of the Stinger Stacker, because there was unequal extension of the lift arms by the hydraulic cylinders. Conveyor argues that SunSource was not hired to provide a flow divider, but a hydraulic lift package, and that SunSource should have designed a package in which both cylinders would lift equally to satisfy the ordinary purposes of such a package. Conveyor

argues that equal extension of the lifts was not only its own particular purpose, but the *ordinary* purpose of such a hydraulic lift package. Conveyor also argues that the 10% variance possible with the flow divider that SunSource selected was not what Conveyor requested, nor was Conveyor ever told about the magnitude of the variance possible with the selected flow divider. Consequently, Conveyor contends that, just as in *J.R. Cartillar v. Turbine Conversions, Ltd.*, 187 F.3d 858 (8th Cir. 1999), the hydraulic lift package supplied by SunSource would not pass without objection in the trade under the contract description, because the variance possible with the Sterling flow divider was so significantly different from what it was represented to be that the flow divider did not provide a 50/50 split of the hydraulic fluid.

In reply, SunSource contends that the evidence Conveyor marshals to try to show that "equal" extension of the two hydraulic cylinders was the *ordinary* purpose of a hydraulic lift package is inadequate, because it consists only of evidence of Conveyor's *particular* purpose. SunSource contends that the product it supplied was what it purported to be, because there is no evidence that the flow divider did not perform as it was designed to perform. SunSource also contends that Conveyor has provided no evidence of what would pass in the trade as an adequate hydraulic lift package based on Conveyor's specifications.

### 3.    *Applicable law*

The Iowa Supreme Court has "observed that a warranty of merchantability 'is based on a purchaser's reasonable expectation that goods . . . will be free of significant *defects* and will perform in the way goods of that kind should perform.'" *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159, 180-81 (Iowa 2002) (quoting *Van Wyk v. Norden Labs.,*

*Inc.*, 345 N.W.2d 81, 84 (Iowa 1984), with emphasis added in *Wright*).[1] As opposed to the implied warranty for a *particular* purpose, "the implied warranty of merchantability involves the fitness of goods for their *ordinary* purpose." *Renze Hybrids, Inc. v. Shell Oil Co.*, 418 N.W.2d 634, 638 (Iowa 1988) (emphasis added); *Van Wyk*, 345 N.W.2d at 87 (in contrast to a claim of breach of warranty for a particular purpose, a claim of breach of "the warranty of merchantability does not require evidence of a particular purpose or of the seller's knowledge of a particular purpose of the buyer, or that the seller had reason to know the buyer was relying on the seller's skill and judgment, or that the buyer in fact relied upon the seller's skill and judgment"). Thus, to prove a claim of breach of the implied warranty of merchantability, "the plaintiff [must] prove (1) a merchant sold the goods, (2) the goods were not "merchantable" at the time of sale, (3) injury or damage occurred to the plaintiff's property, (4) the defective nature of the goods caused the damage 'proximately and in fact,' and (5) notice was given to the seller of the damage." *Id.* (citing *Van Wyk*, 345 N.W.2d at 87). Here, it is the second element that SunSource challenges in its motion for partial summary judgment on Conveyor's claim of breach of warranty of merchantability.

As to the challenged element, the Iowa Supreme Court recently explained that "the implied warranty of merchantability is statutory." *Wright*, 652 N.W.2d at 179. Therefore, as to the "merchantable" goods element, the court looked to the governing act, Iowa Code § 554.2314, a provision of Iowa's version of the Uniform Commercial Code

---

[1]The court also explained in *Wright* that, although personal injury claims involving product defects may be submitted under both strict liability and breach of warranty theories, "where only economic loss is alleged, recovery is limited to warranty claims." *Id.* at 181. This court will return to this limitation on claims based on the nature of damages, below, in its consideration of SunSource's motion for summary judgment on Count III of Conveyor's Complaint.

(UCC), for guidance. *Id.* Then, as now, the applicable statute provided, in pertinent part, as follows:

> **554.2314. Implied warranty: merchantability--usage of trade**
>
> 1. Unless excluded or modified (section 554.2316), a warranty that the goods shall be merchantable is implied in a contract for their sale if the seller is a merchant with respect to goods of that kind. . . .
>
> 2. Goods to be merchantable must be at least such as
>
> > a. pass without objection in the trade under the contract description; and
> >
> > b. in the case of fungible goods, are of fair average quality within the description; and
> >
> > c. are fit for the ordinary purposes for which such goods are used; and
> >
> > d. run, within the variations permitted by the agreement, of even kind, quality and quantity within each unit and among all units involved; and
> >
> > e. are adequately contained, packaged, and labeled as the agreement may require; and
> >
> > f. conform to the promises or affirmations of fact made on the container or label if any.

IOWA CODE § 554.2314(1) & (2) (1999); *see also Wright*, 652 N.W.2d at 179 (quoting the statute). Although these requirements for merchantability "are conjunctive," *see Randa v. United States Homes, Inc.*, 325 N.W.2d 905, 911 (Iowa Ct. App. 1982), and consequently, are *all* required, the parties agree that only definitions (a) and (c) are implicated here by Conveyor's claim of breach of warranty of merchantability.

## 4.  Analysis

### a.  *"Merchantability" under § 554.3214(2)(a)*

In deciding whether or not a product meets the definition of "merchantable" goods in subsection (2)(a)—that is, whether or not the goods would "pass without objection in the trade under the contract description," IOWA CODE § 554.2314(2)(a)—the Iowa Court of Appeals has examined whether the product in question was "defective as manufactured" and whether it was "manufactured in conformance with applicable industrial standards." *Randa*, 325 N.W.2d at 910.  Nothing in the record (or the arguments of the parties) suggests that the hydraulic lift package of the Stinger Stacker, or any part of that lift package, was "defective as manufactured" or was not "manufactured in conformance with applicable industrial standards." *Id.*  Rather, the essence of Conveyor's arguments and the thrust of the expert testimony in the record on which Conveyor relies is that the hydraulic lift package was not properly *designed* for the ordinary purpose of a hydraulic lift package with dual cylinders.

As to improper *design*, the parties' focus has been on the language of the statutory definition of "merchantable" goods in § 554.3214(2)(a).  SunSource points to evidence that the dual cylinder hydraulic lift package it provided would "pass without objection in the trade under the contract description," *see* IOWA CODE § 554.2314(2)(a), *as SunSource contends the requirements of the contract had been described to its representative.* Specifically, SunSource points to evidence that it was originally told that the two cylinders would be mechanically linked, and was never told that the mechanical linkage had been removed from the design, even when Conveyor demanded the inclusion of a flow divider.  Thus, SunSource has pointed to evidence that a hydraulic lift package with the selected flow divider would "pass without objection in the trade under the contract description," because it has pointed to evidence that it satisfied Conveyor's demand for a flow divider

and satisfied a purportedly "ordinary" expectation that the twin cylinders would extend the lift arms equally, with or without that flow divider, *where the cylinders were mechanically linked*. Conveyor, on the other hand, argues that the hydraulic lift package provided by SunSource would not "pass without objection in the trade under the contract description," because the contract purportedly required a 50/50 flow divider and required that the two cylinders would provide "equal" extension. More specifically, Conveyor contends that the hydraulic lift package would not "pass without objection in the trade under the contract description," because the 50/50 flow divider *with a 10% variance* was significantly different from a flow divider that actually provided 50/50 division of the flow of hydraulic fluid, citing *Cartillar v. Turbine Conversions, Ltd.*, 187 F.3d 858, 861 (8th Cir. 1999).

Taking the record in the light most favorable to Conveyor, as the non-moving party, *see Matsushita Elec. Indus. Co.*, 475 U.S. at 587; *Quick*, 90 F.3d at 1377, Conveyor has generated a genuine issue of material fact that its representatives indicated to SunSource that there would be no mechanical linkage between the cylinders and that the flow divider was, consequently, the *only* part of the Stinger Stacker that would ensure that the twin lifts extended equally. Conveyor has also generated a genuine issue of material fact that, in the absence of any mechanical linkage, a 50/50 flow divider with a 10% variance would *not* pass without objection under the contract description, where the 10% variance was significantly more than 50/50 flow dividers "ordinarily" allowed and the flow divider was the *only* part of the Stinger Stacker that would maintain synchronization between the cylinders. *Cf. Cartillar*, 187 F.3d at 861 (a used aircraft engine with significantly more cycles on life-limited parts than had been represented to the buyer would not "pass without objection in the trade under the contract description," applying Arkansas's version of UCC 2-314(2)(a)).

In short, the question of whether or not the hydraulic lift package provided by SunSource would have "passed without objection in the trade under the contract description" hangs on issues of fact about what the "contract description" was, specifically, whether or not the contract description involved cylinders that were or were not to be mechanically linked. Therefore, SunSource is not entitled to summary judgment on the question of whether it satisfied the "merchantable" goods definition in IOWA CODE § 554.2314(2)(a). *See* FED. R. CIV. P. 56(c) (the moving party is only entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law).

### b. *"Merchantability" under § 554.3214(2)(c)*

In addition or in the alternative, the court will consider whether SunSource is entitled to summary judgment that the hydraulic lift package satisfied the definition of "merchantable" goods in subsection (2)(c)—that is, whether the goods "are fit for the ordinary purposes for which such goods are used." IOWA CODE § 554.2314(2)(c). In *Randa*, the Iowa Court of Appeals explained that, as opposed to *particular* purposes, "'ordinary purposes . . . go to uses which are customarily made of the goods in question.'" *Randa*, 325 N.W.2d at 911 (quoting Uniform Commercial Code, cmt. 2, 35 IOWA CODE § 554.2315). Whether goods are "fit" for their "ordinary purposes," the court explained, is a question best answered by expert testimony. *Id.*

Here, SunSource points to expert and other evidence that devices into which hydraulic lifts involving dual cylinders are incorporated "customarily" involve a mechanical linkage between the cylinders to ensure "equal" extension of the lift arms, as well as evidence that no flow divider is "customarily" required where a mechanical linkage is used, let alone a 50/50 flow divider with less than a 10% variance. Conveyor, on the other hand, has pointed to evidence that the design in this case involved no mechanical

linkage between the cylinders, so that, under the facts as Conveyor contends they existed, the question is whether a hydraulic lift package using a 50/50 flow divider with a 10% variance would "customarily" be used. Again citing *Cartillar*, 187 F.3d 858, Conveyor contends that it is not improperly merging the "ordinary" purpose of the hydraulic lift package with Conveyor's "particular" purpose, because the ordinary purpose of a hydraulic lift package using dual cylinders is to provide "equal" extension of the cylinders.

Conveyor is correct that in *Cartillar*, the Eighth Circuit Court of Appeals observed, "In Arkansas, '[i]f the particular purpose for which goods are to be used coincides with their general functional use, the implied warranty of fitness for a particular purpose merges with the implied warranty of merchantability.'" *Cartillar*, 187 F.3d at 861 n.5 (quoting *Great Dane Trailer Sales, Inc. v. Malvern Pulpwood, Inc.*, 301 Ark. 436, 785 S.W.2d 13, 17 (1990)). Assuming without deciding that the Iowa Supreme Court would recognize a similar principle, the question is whether Conveyor has generated a genuine issue of material fact that its particular purpose for the twin cylinder hydraulic lift package in the Stinger Stacker "coincides" with the "general functional use" of twin cylinder hydraulic lift packages. Conveyor contends that there is, at the very least, a genuine issue of material fact that the "general functional use" of a twin cylinder hydraulic lift system would be to extend the twin lift arms "equally," and that there is, at the very least, a genuine issue of material fact as to whether this "general functional use" merely coincides with the requirements of its particular purpose for the hydraulic lift package in the Stinger Stacker, based on expert testimony.[2] SunSource contends that Conveyor is improperly

---

[2]Indeed, Conveyor seems to assert that there is *no* dispute on these points, but Conveyor has not moved for summary judgment on these issues.

blurring its particular use for the hydraulic lift package *in the Stinger Stacker* with the "general functional use" of a hydraulic lift package involving twin cylinders.

The court concludes that Conveyor has generated a genuine issue of material fact that "equal" extension of the lift arms was the "particular purpose" of the hydraulic lift package in the Stinger Stacker by pointing to expert testimony concerning the design (and failure) of the Stinger Stacker. Specifically, in the Stinger Stacker, because there was no mechanical linkage between the cylinders to maintain synchronization, the "flow divider" in the hydraulic lift package was the sole component of the design of the Stinger Stacker as a whole that was responsible for maintaining "equal" extension of the lift arms. Indeed, SunSource does not appear to dispute that the particular purpose of the hydraulic lift package in the Stinger Stacker was to lift the arms "equally," if there was no mechanical linkage between the cylinders, although SunSource does dispute whether it was ever *told* that there would be no such mechanical linkage.

In contrast, the parties plainly differ on what is the *ordinary purpose* or "general functional use" of a twin cylinder hydraulic lift package. SunSource contends that the "general functional use" of such a lift package is to meet the load-lifting capacity and extension requirements of the contract. SunSource contends that it satisfied the "general functional use" of a twin cylinder hydraulic lift package by providing such a package capable of meeting the load-lifting and extension requirements of the contract. SunSource has pointed to evidence that *how* "equal" extension of the lift arms is achieved depends upon the *particular design* of the apparatus into which the hydraulic lift package is incorporated. Specifically, SunSource points to evidence that, *ordinarily*, "equal" extension between twin cylinders in a hydraulic lift package is maintained by a *mechanical linkage* between the cylinders, not by the hydraulic lift package itself. The need for the hydraulic lift package, and more particularly, for the flow divider in that lift package, to

maintain "equal" extension, SunSource argues, was Conveyor's *particular* use, where unbeknownst to SunSource, Conveyor had removed the mechanical linkage that would ordinarily have maintained the synchronization between the cylinders.

Notwithstanding SunSource's contentions, the court finds that Conveyor has, although perhaps just barely, generated a genuine issue of material fact that the "general functional use" of a hydraulic lift package involving twin cylinders, rather than the entire apparatus in which the hydraulic lift package is used, is to maintain "equal" extension between the lift arms. Conveyor has done so primarily by pointing to evidence of the general agreement among experts involved in this case that maintaining "equal" extension between the lift arms is essential in a twin cylinder hydraulic lift package. The court observes that the extent to which there really is such a general agreement is subject to nuances and context in the testimony and reports of the experts, particularly as to whether the experts were talking about twin cylinder hydraulic lift packages in general, or the twin cylinder hydraulic lift package in the Stinger Stacker, or the design of this particular apparatus as a whole, when their comments about maintaining "equal" extension were elicited. Such nuances, which go to the weight and credibility of the experts' testimony on this point, are squarely within the province of the jury. *See Quick*, 90 F.3d at 1376-77 (the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial); *Johnson*, 906 F.2d at 1237 (same). Thus, SunSource is not entitled to summary judgment on Conveyor's "merchantability" claim on the ground that Conveyor has improperly blurred its "particular purpose" with the "ordinary purpose" of the hydraulic lift package.

Although the parties did not squarely address the issue, for the sake of completeness, the court believes that it must also consider the Iowa Supreme Court's most

recent explanation of the "merchantable" goods definition in § 554.2314(2)(c). Twenty years after the decision of the Iowa Court of Appeals in *Randa*, discussed above, the Iowa Supreme Court explained in *Wright*,

> [C]onduct that gives rise to a warranty claim based on fitness for ordinary purposes mirrors conduct that gives rise to tort liability for a defective product. Thus, warranty liability under section 554.2314(2)(c) requires proof of a product defect as defined in Products Restatement section 2.

*Wright*, 652 N.W.2d at 182. The cited provision of the RESTATEMENT provides, in pertinent part, as follows:

> **§ 2. Categories Of Product Defect**
> A product is defective when, at the time of sale or distribution, it . . . is defective in design. . . . A product:
> * * *
> (b) is defective in design when the foreseeable risks of harm posed by the product could have been reduced or avoided by the adoption of a reasonable alternative design by the seller or other distributor, or a predecessor in the commercial chain of distribution, and the omission of the alternative design renders the product not reasonably safe.

RESTATEMENT (THIRD) OF TORTS—PRODUCTS LIABILITY § 2(b) (1998).

Here, there is no genuine issue of material fact that SunSource was aware of the availability of flow dividers that would have provided a smaller variance between the extension of the cylinders, satisfying at least part of the test of a defective design under § 2(b) of the RESTATEMENT. Specifically, SunSource acknowledges that more accurate flow dividers were readily available, including a "gear" type, which could have provided ninety-eight percent accuracy in flow to each cylinder, and an "electronic" type, which could have provided synchronization of the cylinders to within a few millimeters of extension. Consequently, the issue here is the foreseeability of risks of harm posed by the

19

hydraulic lift package if a 50/50 flow divider with as much as a 10% variance in flow between the cylinders was employed in the lift package for the Stinger Stacker. *See id.* (requiring both a safer alternative design and foreseeability of the risks of harm posed by the product). SunSource contends that there is no dispute that it did not know that there would be no mechanical linkage between the cylinders in the Stinger Stacker, so that the flow divider would be the sole component of the entire design of the Stinger Stacker that would maintain "equal" extension between the cylinder lift arms. Under these circumstances, SunSource contends that it could not possibly foresee any risk of harm posed by the hydraulic lift package using the flow divider it had selected. Conveyor disputes that evidence with testimony of its own representatives that the primary designer for SunSource was told not only that a flow divider was required, but that there would be no mechanical linkage between the cylinders in the Stinger Stacker. Again, whatever the court's view of the sufficiency of the evidence to determine the question, *see Quick*, 90 F.3d at 1376-77 (the judge's function at the summary judgment stage of the proceedings is not to weigh the evidence and determine the truth of the matter, but to determine whether there are genuine issues for trial); *Johnson*, 906 F.2d at 1237 (same), Conveyor's evidence is sufficient to generate a jury question on the issue and to defeat SunSource's motion for summary judgment on the "merchantability" claim. *See Anderson*, 477 U.S. at 248 (to avoid summary judgment, the evidence identified by the nonmoving party must be "such that a reasonable jury could return a verdict for the nonmoving party"); *Allison*, 28 F.3d at 66 (same).

Therefore, the court will deny SunSource's motion for summary judgment on Count II of Conveyor's Complaint.

### C. The Strict Liability Claim

#### 1. The claim

SunSource has also moved for summary judgment on Conveyor's "strict liability" claim in Count III. In that claim, Conveyor alleges that SunSource "designed, manufactured and sold the hydraulic lift package utilized in the Stacker" and that "[t]he hydraulic lift package was defective in design and manufacture, was unreasonably dangerous to the user or consumer when used in a reasonably foreseeable manner, and was so defective at the time it left the hands of [SunSource]." Complaint, Count III, ¶¶ 28-29. Specifically, Conveyor alleges that "[t]he hydraulic lift package, as designed and manufactured, failed to lift both hydraulic lifts simultaneously to the same height, thus leading to the collapse and destruction of the Stacker." *Id.* at ¶ 30. As with its "merchantability" claim, Conveyor seeks judgment in the amount of $560,400 for "general damages." *Id.* at ¶ 31. Conveyor alleges that, as a result of the defective design of the hydraulic lift package, Conveyor suffered "consequential damages in the form of loss [of] profits and loss of good will, as well as incidental damages including sums expended by Plaintiff to investigate the collapse of the Stacker." *Id.* at ¶ 32. Therefore, Conveyor seeks consequential damages, incidental damages, attorneys fees, and costs. *See id.* at Prayer.

#### 2. Arguments of the parties

SunSource contends that Conveyor cannot, as a matter of law, assert a strict liability products liability claim concerning the collapse of the Stinger Stacker, because Conveyor makes no claim of personal injury or of property damage other than to the Stinger Stacker itself. Rather, SunSource contends, Conveyor seeks only damages for economic loss, which do not support such a claim. SunSource points out that Conveyor has not identified any evidence of harm to any individual or any property other than the Stinger Stacker

itself. Consequently, SunSource contends that Conveyor's remedies, if any, lie in contract or warranty.

In response, Conveyor does not dispute that it seeks primarily damages for economic loss, but contends that the nature of the damages it seeks is not dispositive of its strict liability claim. Although Conveyor acknowledges that an assertion of losses only to the product itself, in this case, the Stinger Stacker, ordinarily would exclude recovery under a products liability theory, Conveyor nevertheless contends that tort remedies are appropriate when the harm is a sudden or dangerous occurrence resulting from a general hazard in the nature of a product defect, as was the case here. Conveyor also argues that the exposure of persons or property to the *risk* of injury in this case is a "non-economic loss" to Conveyor sufficient to present its strict liability claim to a jury. The key to the viability of its strict liability claim, Conveyor contends, is not the presence or absence of physical harm, but whether the defect was dangerous to the user, as Conveyor contends that the alleged defect in this case was. In support of its arguments, Conveyor relies primarily on *Richards v. Midland Brick Sale Company, Inc.*, 551 N.W.2d 649 (Iowa Ct. App. 1996), and *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103 (Iowa 1995). Conveyor contends that there is evidence that it was exposed to the risk of injury through a dangerous product, because the collapse of the Stinger Stacker threatened personal injury to two men standing nearby. Indeed, Conveyor points to the testimony of these men that, had the Stinger Stacker fallen straight down, it would have hit them. Only owing to good fortune, Conveyor asserts, did the Stinger Stacker collapse slightly to one side, missing the men on the ground, and causing only property damage to the Stinger Stacker itself. At oral arguments, Conveyor's counsel referred to its theory as a "zone of danger" theory of tort liability.

In reply, SunSource describes Conveyor's argument as "creative," but contends that Conveyor is ignoring controlling authority that it cannot recover in tort if it suffered only economic loss because of damage to the product itself. SunSource contends that Conveyor is not relying on any recognized exception to the economic loss rule, because it is relying on merely hypothetical risks of personal injury for which no actual claim is made.

### 3. *Applicable law*

As noted above, in *Wright v. Brooke Group, Ltd.*, 652 N.W.2d 159 (Iowa 2002), the Iowa Supreme Court reiterated the rule that, while personal injury claims may be submitted under both strict liability and breach-of-warranty theories, "where only economic loss is alleged, recovery is limited to warranty claims." *Wright*, 652 N.W.2d at 181; *Mercer v. Pittway Corp.*, 616 N.W.2d 602, 621 (Iowa 2000) (recognizing "the well established general rule that 'purely economic injuries without accompanying physical injury to the user or consumer or to the user or consumer's property is not recoverable under strict liability,'" although it was permissible, in that case, to submit both a strict liability claim and a breach of warranty claim, where the plaintiffs claimed personal injuries, but not property damages) (quoting *Nelson v. Todd's, Ltd.*, 426 N.W.2d 120, 123 (Iowa 1998)). In *Determan v. Johnson*, 613 N.W.2d 259 (Iowa 2000), the Iowa Supreme Court made a comprehensive review of its cases considering the compensability of economic loss damages in tort.[3] That review is worth summarizing here.

In *Determan*, the court noted that, in *Nebraska Innkeepers, Inc. v. Pittsburgh-Des Moines Corp.*, 345 N.W.2d 124 (Iowa 1984), it had "adopted the general rule that a plaintiff 'cannot maintain a claim for purely economic damages arising out of [a]

---

[3]Strangely, neither party cites *Determan* in its arguments concerning this portion of SunSource's motion for partial summary judgment, despite the comprehensive review of the "economic loss doctrine" under Iowa law in that decision.

defendant's alleged negligence.'" *Determan*, 613 N.W.2d at 261 (quoting *Nebraska Innkeepers*, 345 N.W.2d at 128). The court also noted that it had subsequently "extended this rule to bar claims based on strict liability in tort where a product sold by the defendant to the plaintiff failed to perform as it was expected, but caused no physical injury to person or property." *Id.* at 261-62 (citing *Nelson*, 426 N.W.2d at 123).

The court then explained further refinements of the "economic loss doctrine" in Iowa decisions:

> [In *Nelson*,] [w]e refined the *Nebraska Innkeepers* rule by stating:
>
>> We agree that the line to be drawn is one between tort and contract rather than between physical harm and economic loss. . . . When, as here, the loss relates to a consumer or user's disappointed expectations due to deterioration, internal breakdown or non-accidental cause, the remedy lies in contract.
>>
>> Tort theory, on the other hand, is generally appropriate when the harm is a sudden or dangerous occurrence, frequently involving some violence or collision with external objects, resulting from a genuine hazard in the nature of the product defect.
>
> [*Nelson*, 426 N.W.2d] at 125 (citation omitted). In deciding whether a particular claim is cognizable in tort or contract, we quoted with approval the following analysis suggested by a federal court of appeals:
>
>> "[T]he line between tort and contract must be drawn by analyzing interrelated factors such as the nature of the defect, the type of risk, and the manner in which the injury arose. These factors bear directly on whether the safety-insurance policy of tort law or the expectation bargain protection policy of warranty law is most applicable to a particular claim."
>
> *Id.* at 124-25 (quoting *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1173 (3rd Cir.

1981)). *Notwithstanding our adherence to this multi-factor test, we have required at a minimum that the damage for which recovery is sought must extend beyond the product itself. Compare Flom v. Stahly*, 569 N.W.2d 135, 141 (Iowa 1997) (holding plaintiff's claim was contractual in nature because harm caused by defect was limited to product), *with American Fire & Cas. Co. v. Ford Motor Co.*, 588 N.W.2d 437, 438-39 (Iowa 1999) (permitting tort recovery where defect caused a sudden and dangerous occurrence causing damage not only to the product but to other property as well).

*Determan*, 613 N.W.2d at 262 (emphasis added).

In *Determan*, the court then used two of its cases to illustrate the distinction between tort claims and contract claims based on a defective product, *Tomka v. Hoechst Celanese Corp.*, 528 N.W.2d 103 (Iowa 1995), upon which Conveyor now relies, and *American Fire & Cas. Co. v. Ford Motor Co.*, 588 N.W.2d 437 (Iowa 1999):

In *Tomka*, the plaintiff operated a custom [cattle] feeding operation. 528 N.W.2d at 105. He sued the manufacturer of a growth hormone given to cattle that the plaintiff had contracted to feed to market weight. *Id.* The plaintiff claimed that the cattle did not gain weight as quickly as they should have and, as a result, it took the plaintiff longer to raise the cattle to a saleable weight. *Id.* As a consequence of the extended feeding period, the plaintiff's expenses were greater and he lost money on his custom feeding contracts. *Id.* Applying the rule set forth in *Nelson*, we held that the plaintiff could not recover under tort theories of liability because the product simply failed to do what it was supposed to do—promote the cattle's growth. *Id.* at 107. We noted that "contract law protects a purchaser's expectation interest that the product received will be fit for its intended use." *Id.*

In contrast, in *American Fire*, we permitted a tort recovery when the defect in the product—a truck—caused a fire that damaged the truck and its contents. 588 N.W.2d at 438. We observed that "tort theory is generally available

> when the harm results from 'a sudden or dangerous
> occurrence, frequently involving some violence or collision
> with external objects, resulting from a genuine hazard in the
> nature of the product defect.'" *Id.* at 439 (emphasis omitted)
> (quoting *Nelson*, 426 N.W.2d at 125).

*Determan*, 613 N.W.2d at 262.

In *Determan*, the Iowa Supreme Court concluded that the plaintiff's damages for defective construction of a house consisted of the expenses she had incurred and would incur to repair the defects in the house's construction. *Id.* at 263. The court concluded that the plaintiff's claim sounded in contract, not tort, for the following reasons:

> Here, the defects at issue involve the quality of the home
> purchased by the plaintiff. Although these defects present a
> genuine safety hazard to persons and property, that risk has
> not come to pass. Thus, the injury at present, and the one for
> which recovery is sought, is limited to repair of the defective
> construction. The plaintiff is not seeking to recover damages
> from any "sudden or dangerous occurrence." *See Nelson*, 426
> N.W.2d at 125. Rather, the plaintiff's damages result from
> the deterioration of the house due to its poor construction.
>
> The plaintiff argues that because the house presents a
> danger to its occupants, a tort recovery should be allowed.
> But this argument ignores the fact that our decision rests on a
> consideration of not only the type of risk, but also the nature
> of the defect, the manner in which the injury occurred, and the
> specific injury for which compensation is sought. Based on a
> weighing of all of these factors, we conclude that the plaintiff's
> claim is based on her unfulfilled expectations with respect to
> the quality of the home she purchased. Accordingly, her
> remedy lies in contract law, not tort law. *See American Fire*,
> 588 N.W.2d at 439 ("'defects of suitability and quality are
> redressed through contract actions'" (quoting *Northridge Co.*
> *v. W.R. Grace & Co.*, 162 Wis.2d 918, 471 N.W.2d 179, 185
> (1991))).

*Determan*, 613 N.W.2d at 263 (also concluding that the plaintiff's recovery could not be reduced by the plaintiff's comparative fault, because the comparative fault statute was limited to liability in tort).

### 4. *Analysis*

The court concludes that Conveyor's injuries arise from an "'internal breakdown or non-accidental cause,'" the alleged failure of the hydraulic lift package to maintain "equal" extension of the lift arms, so that the remedy "'lies in contract,'" not from "'a sudden or dangerous occurrence, [such as one] involving some violence or collision with external objects, resulting from a genuine hazard in the nature of the product defect,'" such that the remedy would lie in tort. *Id.* at 262 (quoting *Nelson*, 426 N.W.2d at 125 ). Here, just as in *Determan*, although the alleged defects in the hydraulic lift package may have "presented a genuine safety hazard to persons and property, that risk has not come to pass." *Id.* at 263. Here, there is no genuine issue of material fact that "the injury at present, and the one for which recovery is sought, is limited to repair of the defective" hydraulic lift package and the Stinger Stacker. *Id.* Even though Conveyor contends that its injury arose from a "sudden or dangerous occurrence"—the collapse of the Stinger Stacker—and not from the deterioration of the Stinger Stacker due to its poor construction or poor design, as was the case in *Determan*, that is simply not enough to turn what is essentially a warranty-based claim of failure to meet expectations into a tort claim.

More specifically, looking to the danger to the two men on the ground near the Stinger Stacker when it collapsed as the basis for allowing a tort recovery "ignores the fact that [the court's] decision rests on a consideration of not only the type of risk, but also the nature of the defect, the manner in which injury occurred, and the specific injury for which compensation is sought." *See id.* "Based on a weighing of all of these factors," this court, like the court in *Determan*, "concludes that the plaintiff's claim is based on [its] unfulfilled

expectations with respect to the quality of the [product] [it] purchased." *Id.* This is so, because the nature of the defect is alleged to be failure to do what the hydraulic lift package was intended to do, not creation of a hazard, and while the "injury" may have occurred from a sudden failure of the product, the specific injury for which compensation is sought is merely economic loss, not personal or property injury extending beyond the product. Moreover, in *Determan*, the court reiterated that, notwithstanding the Iowa Supreme Court's adherence to a multi-factor test to determine whether a claim was a contract claim or a tort claim, for a claim to sound in tort, the court had "required at a minimum that the damage for which recovery is sought must extend beyond the product itself." *Id.* at 262. In this case, that "minimum" requirement for the availability of tort remedies is not present, where the only damage actually alleged by Conveyor is to the Stinger Stacker itself.[4] Thus, here, as in *Determan*, the plaintiff's "remedy lies in contract law, not tort law." *Id.* at 263.

As the decision in *Determan* suggests, Conveyor's reliance on *Tomka* for a contrary result is simply misplaced. In *Tomka*, the court recognized that the presence or absence of physical harm was not the determinative factor in whether or not the plaintiff could assert a tort claim or a contract claim. *Tomka*, 528 N.W.2d at 106. Nevertheless, the court held that the damages the plaintiff had suffered from an ineffective growth hormone for cattle, which increased the time and cost to raise the cattle to market weight, thus decreasing the plaintiff's economic benefits from using the growth hormone, clearly fell

---

[4]Although Conveyor does allege loss of good will as the result of the collapse of the Stinger Stacker, the Iowa Supreme Court recognized in *Tomka* that "[f]or purposes of warranty and tort analysis, loss of good will is an economic loss." *Tomka*, 528 N.W.2d at 107 n.2 (quoting *Beyond the Garden Gate, Inc. v. Northstar Freeze-Dry Mfg., Inc.,* 526 N.W.2d 305 (Iowa 1995), and 1 James J. White & Robert S. Summers, *Uniform Commercial Code* § 11-6, at 539 (3d ed. 1988)).

within contract-warranty theories, not tort theories, because it amounted to a claim that the product had failed to do what it was expected to do. *Tomka*, 528 N.W.2d at 106. Thus, the court in *Tomka* found that the economic loss doctrine barred the plaintiff's tort claims. That holding does nothing to support Conveyor's contention that a tort claim can be based on the possibility of risk of personal injury or injury to other property, where no such injury occurred either in *Tomka* or in this case, and the court in *Tomka* plainly did not acknowledge that mere *risk* of injury beyond damage to the product itself was adequate to support a tort claim.

Also misplaced is Conveyor's reliance on *Richards v. Midland Brick Sales Co., Inc.*, 551 N.W.2d 649 (Iowa Ct. App. 1996). In *Richards*, the court did recognize that "when the harm is a sudden or dangerous occurrence resulting from a general hazard in the nature of the product defect, tort remedies are generally appropriate because the harm could not have been reasonably anticipated by the parties." *Richards*, 551 N.W.2d at 651 (citing *Nelson*, 426 N.W.2d at 125). However, the court in *Richards* did not find that tort remedies were available in the case before it. Rather, the court found that the plaintiff had not submitted any evidence to show that the allegedly defective brick had caused actual damage to other portions of the plaintiff's home and also found that the policies underlying contract law related to the nature of the damage claimed by the plaintiff. *Id.* Again, the holding in *Richards* that the trial court had properly dismissed the plaintiff's negligence and strict liability claims does nothing to support Conveyor's contention that it can base a viable strict liability claim on the possibility of risk of personal injury or injury to other property, where no such injury actually occurred, either in *Richards* or in this case, and it does not appear that the plaintiff in *Richards* ever argued that a risk of personal injury was sufficient to support a strict liability claim. *See id.*

In this court's view, *American Fire and Casualty Company v. Ford Motor Company*, 588 N.W.2d 437 (Iowa 1999), might have provided better, although ultimately unpersuasive, support for Conveyor's position. In *American Fire*, a truck owned by the plaintiff's insured caught fire causing property damage to the truck and its contents. *American Fire*, 588 N.W.2d at 438. In *American Fire*, the court observed that "[t]he common thread running through our cases rejecting recovery [in tort] is the lack of danger created by the defective product," because the "hazard and danger distinguish tort liability from contract law" and "distinguish the disappointed consumers from the endangered ones." *Id.* at 439-40. Noting that "[f]ire has been characterized as a 'sudden and highly dangerous occurrence,'" the court concluded that "[a] truck starting itself on fire would certainly qualify more as a danger than as a disappointment," so that the insurer's product liability claim should have been allowed to proceed on its merits. *Id.* at 440 (quoting *Pennsylvania Glass Sand Corp. v. Caterpillar Tractor Co.*, 652 F.2d 1165, 1174 (3d Cir. 1981)).

Like the fire in the truck in *American Fire*, the collapse of the Stinger Stacker was apparently "sudden," and could possibly have been characterized as a "highly dangerous occurrence." *See id.* That far, *American Fire* supports Conveyor's contention that it has a viable strict liability claim. However, in this case, it was not the *consumer*, Conveyor, who was "endangered." Rather, Conveyor was simply a "disappointed consumer," because the hydraulic lift package allegedly did not perform as Conveyor expected it to. Moreover, the Iowa Supreme Court held in *Determan* that, despite the existence of precedent such as *American Fire*, the court had "required at a minimum that the damage for which recovery is sought must extend beyond the product itself," which is not the case here. *Determan*, 613 N.W.2d at 262 (comparing *Flom v. Stahly*, 569 N.W.2d 135, 141 (Iowa 1997), which the court characterized as holding that the plaintiff's claim was

contractual in nature because the harm caused by the defect was limited to the product, with *American Fire*, 588 N.W.2d at 438-39, which the court characterized as permitting tort recovery where the defect caused a sudden and dangerous occurrence causing damage not only to the product but to other property as well). Thus, while *American Fire* may lend some support to Conveyor's position, the subsequent decision in *Determan* clarifies that Conveyor's present claim does not meet the requirements of a tort claim.

While there are contexts in which placing someone in a "zone of danger" will give rise to tort liability, *see, e.g., Hernandez v. Midwest Gas Co.*, 523 N.W.2d 300, 305-06 (Iowa Ct. App. 1994) (the "zone of imminent danger" defines persons who may assert a claim for a co-employee's gross negligence); *Bartlett v. Chebuhar*, 479 N.W.2d 321, 322-23 (Iowa 1992) (a golfer may be liable to anyone who lies in the "zone of danger" for failure to warn prior to taking a shot), contrary to Conveyor's contention, there is no "zone of danger" exception to the "economic loss doctrine," *i.e.*, no suggestion in Iowa cases that a "sudden or dangerous occurrence," standing alone, will transform what is otherwise a contract or breach of warranty claim into a strict products liability claim, in the absence of personal injury or property damage extending beyond damage to the product itself. Nor has any Iowa court ever suggested that the mere *risk* of physical injury to someone somehow constitutes "non-economic loss," as Conveyor also contends. Indeed, *Determan* is to the contrary, because it rejected the argument that "because the house presents a danger to its occupants, a tort recovery should be allowed." *Determan*, 613 N.W.2d at 263. The court pointed out that "this argument ignores the fact that our decision rests on a consideration of not only the type of risk, but also the nature of the defect, the manner in which the injury occurred, and the specific injury for which compensation is sought," *id.*, and also recognized that, "notwithstanding [the court's] adherence to this multi-factor test, [the court has] required at a minimum that the damage

31

for which recovery is sought must extend beyond the product itself." *Id.* at 262. Thus, risk of personal injury, standing alone, is simply not enough under Iowa law for a resulting claim to sound in tort, and in this case, the other factors weigh in favor of a contract or warranty claim, not a tort claim. Conveyor's argument is "creative," but that label here, as is often the case, is a judicial kiss of death to Conveyor's strict liability theory.

Therefore, as a matter of law, Conveyor's claim sounds in contract or warranty, but not in tort, and SunSource is entitled to summary judgment on Conveyor's strict liability claim in Count III of Conveyor's Complaint. *See* FED. R. CIV. P. 56(c) (the moving party is only entitled to summary judgment if there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law).

### D. The Negligent Misrepresentation Claim

#### 1. The claim

Finally, SunSource has moved for summary judgment on Conveyor's claim of "negligent misrepresentation" in Count IV of Conveyor's Complaint. In this Count, Conveyor alleges that "[SunSource] represented to [Conveyor] that the Splitter [*i.e.*, the flow divider] would have the specifications listed in the quote and would work properly as recommended by [SunSource]," that "[Conveyor] purchased the Splitter and other parts of the hydraulic lift package based on [SunSource's] representations," but that "[t]hese representations were false," that "[SunSource] knew or reasonably should have known that the representations were false," and that "[t]he false representations of [SunSource] were a proximate cause of [Conveyor's] damages." Complaint, Count IV, ¶¶ 34-38. Again, Conveyor alleges that it suffered "general damages" of $560,400 as the result of that breach, *id.* at ¶ 39, and that it suffered "consequential damages in the form of loss [of]

profits and loss of good will, as well as incidental damages including sums expended by Plaintiff to investigate the collapse of the Stacker." *Id.* at ¶ 40.

## 2. Arguments of the parties

SunSource contends that this tort claim, like Conveyor's tort claim for strict liability, is barred by the "economic loss rule." In addition, SunSource contends that Conveyor has not put forward any evidence of a single false statement that it made to Conveyor. SunSource contends that this is so, because Conveyor's representatives cannot remember anything that was discussed in either of the meetings between Conveyor representatives and SunSource representatives. SunSource also contends that it is not in the business of supplying information, so that it may not be held liable under Iowa law for negligent misrepresentation. Instead, SunSource contends that it was acting on specifications and designs that came from Conveyor and Conveyor's outside engineering consultant. Thus, SunSource contends that it was neither hired nor paid to provide information to Conveyor.

In response, Conveyor first reiterates its "zone of danger" argument that it has shown that it can assert claims arising from the collapse of the Stinger Stacker that sound in tort, because of the risk of personal injury created by the collapse. Next, Conveyor contends that SunSource did falsely represent that the Sterling Flow Divider provided a 50/50 split of hydraulic fluid, when it actually had a 10% variance per leg, and that such a representation was reckless, where SunSource was a company specializing in hydraulics and, therefore, should have known that the accuracy of the split was a critical piece of information in selecting a flow divider. Finally, Conveyor argues that SunSource was in the business of supplying information to Conveyor, because SunSource was a supplier of hydraulics, it had a pecuniary interest in its business relationship with companies such as

Conveyor, it was responsible for the technical design of the hydraulic lift package, and only it would know what information was needed.

In reply, SunSource reiterates that Conveyor's negligent misrepresentation claim is barred by the "economic loss rule." SunSource also contends that Conveyor asked SunSource to supply a "50/50" flow divider, and that, in response, SunSource met that request by providing a quote for a flow divider that is characterized by its manufacturer as a "50/50" flow divider. Thus, SunSource contends that there is no dispute that the information it provided was not false. Moreover, SunSource reiterates that Conveyor has not pointed to any evidence that SunSource was a supplier of information; rather, the only evidence in the record, SunSource contends, demonstrates that the parties engaged in an arm's-length transaction as buyer and seller. To put it another way, SunSource contends that Conveyor has not identified any evidence of a "special relationship" that would give rise to a negligent misrepresentation claim.

### 3. The "economic loss" bar

The court considered in some detail, above, the law that is applicable to a determination of whether the "economic loss doctrine" bars a particular tort claim, such as Conveyor's negligent misrepresentation claim. The court finds that the "economic loss doctrine" bars Conveyor's negligent misrepresentation claim for the same reasons that the doctrine bars Conveyor's other tort claim of strict liability. To summarize, based on a weighing of all of the factors in the applicable multi-factor test, *see Determan*, 613 N.W.2d at 262, the court "concludes that the plaintiff's claim is based on [its] unfulfilled expectations with respect to the quality of the [product] [it] purchased," not on a risk of injury. *Id*. at 261. Moreover, the "minimum" requirement for a tort claim, "that the damage for which recovery is sought must extend beyond the product itself," *see id*. at 262, is not met in this case, where the only damage actually alleged by Conveyor is to the

Stinger Stacker itself. Thus, SunSource is entitled to summary judgment on Conveyor's negligent misrepresentation claim on the basis of the "economic loss doctrine."

### 4. The elements of the claim

In addition or in the alternative, the court will also consider, to the extent necessary, whether there are genuine issues of material fact on any of the challenged elements of Conveyor's claim of negligent misrepresentation. The Iowa Supreme Court "first recognized the tort of negligently giving misinformation" in *Ryan v. Kanne*, 170 N.W.2d 395 (Iowa 1969), and since that time, has continued to find the "genesis" of the tort in RESTATEMENT (SECOND) OF TORTS § 552. *See Sain v. Cedar Rapids Comm. Sch. Dist.*, 626 N.W.2d 115, 123 (Iowa 2001). Section 552 of the RESTATEMENT provides as follows:

> One who, in the course of his business, profession or employment, or in any other transaction in which he has a pecuniary interest, supplies false information for the guidance of others in their business transactions, is subject to liability for pecuniary loss caused to them by their justifiable reliance upon the information, if he fails to exercise reasonable care or competence in obtaining or communicating the information.

RESTATEMENT (SECOND) OF TORTS § 552(1). From this "genesis," the Iowa Supreme Court has recognized that, "[a]s with all negligence actions, an essential element of negligent misrepresentation is that the defendant must owe a duty of care to the plaintiff." *Sain*, 626 N.W.2d at 124; *accord Jensen v. Sattler*, 696 N.W.2d 582, 588 (Iowa 2005) ("Absent a special relationship giving rise to a duty of care, a plaintiff cannot establish negligent misrepresentation."). Although the Iowa Supreme Court has recognized that "the Restatement supports a broader view," that court has determined that, under Iowa law, "this duty arises only when the information is provided by persons in the business or profession of supplying information to others." *Id.*

Thus, the elements of the claim are the following: (1) the defendant was in the business or profession of supplying information to others; (2) the defendant intended to supply information to the plaintiff or knew that the recipient intended to supply it to the plaintiff; (3) the information was false; (4) the defendant knew or reasonably should have known that the information was false; (5) the plaintiff reasonably relied on the information in the transaction that the defendant intended the information to influence; (6) and the false information was the proximate cause of damage to the plaintiff. *See id.* at 127 ("[L]iability for negligent misrepresentation is limited to harm suffered by a person for whose benefit and guidance the counselor intended to supply the information or knew the recipient intended to supply it and to loss suffered through reliance upon the information in a transaction the counselor intended the information to influence. Additionally, we observe that the tort applies only to false information and does not apply to personal opinions or statements of future intent. Finally, the standard imposed is only one of reasonableness, and the elements of proximate cause and damage must also be shown.") (citations and footnote omitted). The elements in dispute here are whether SunSource was "in the business or profession of supplying information," *i.e.*, whether SunSource was under the duty necessary to sustain the claim; whether the information SunSource provided was false; and whether SunSource knew or reasonably should have known that the information was false.

### a.  Definition of the necessary duty

In *Sain*, the Iowa Supreme Court explained the necessary duty more fully. The court explained that, because the necessary duty only arises under Iowa law "when the information is provided by persons in the business or profession of supplying information to others[,] when deciding whether the tort of negligent misrepresentation imposes a duty of care in a particular case, [the court must] distinguish between those transactions where

a defendant is in the business or profession of supplying information to others from those transactions that are arm's length and adversarial.*" Sain*, 626 N.W.2d at 124 (citing *Molo Oil Co. v. River City Ford Truck Sales, Inc.*, 578 N.W.2d 222, 227 (Iowa 1998); *Fry v. Mount*, 554 N.W.2d 263, 265-66 (Iowa 1996); *Freeman v. Ernst & Young*, 516 N.W.2d 835, 838 (Iowa 1994); *Haupt v. Miller*, 514 N.W.2d 905, 910 (Iowa 1994); *Meier v. Alfa-Laval, Inc.*, 454 N.W.2d 576, 581-82 (Iowa 1990)). More specifically,

> We recognize th[at] [transactions where a defendant is in the business or profession of supplying information to others] justify the imposition of a duty of care because a transaction between a person in the business or profession of supplying information and a person seeking information is compatible to a special relationship. *See Meier*, 454 N.W.2d at 581; *see also* 2 Fowler V. Harper et al., *The Law of Torts* § 7.6, at 412-13 (2d ed.1986) [hereinafter Harper] ("remedy for negligent misrepresentation [is] principally against those who advise in an essentially nonadversarial capacity"). A special relationship, of course, is an important factor to support the imposition of a duty of care under a claim for negligence. *See J.A.H. ex rel. R.M.H. v. Wadle & Assocs., P.C.*, 589 N.W.2d 256, 259 (Iowa 1999). Moreover, a person in the profession of supplying information for the guidance of others acts in an advisory capacity and is manifestly aware of the use that the information will be put, and intends to supply it for that purpose. *See Restatement (Second) of Torts* § 552 cmt. a; *see also* Dobbs § 472, at 1350-51; 2 Harper § 7.6, at 405-06. Such a person is also in a position to weigh the use for the information against the magnitude and probability of the loss that might attend the use of the information if it is incorrect. *Restatement (Second) of Torts* § 552 cmt. a. Under these circumstances, the foreseeability of harm helps support the imposition of a duty of care. *See J.A.H. ex rel. R.M.H.*, 589 N.W.2d at 258 (reasonable foreseeability of harm to person who is injured is a factor in deciding whether a legal duty exists). Additionally, the pecuniary interest which a person

> has in a business, profession, or employment which supplies
> information serves as an additional basis for imposing a duty
> of care. *See Restatement (Second) of Torts* § 552 cmts. c, d.
> On the other hand, information given gratuitously or incidental
> to a different service imposes no such duty. *See id.*; *see also*
> *Meier*, 454 N.W.2d at 581-82 (defendant in business of selling
> and servicing merchandise, not supplying information).

*Sain*, 626 N.W.2d at 124-25 (footnote omitted).

In short, where the defendant was "not in the business or profession of supplying information to [the plaintiff]," and the transaction was, instead, "an arms-length and adversarial transaction," the plaintiff cannot prevail on a negligent misrepresentation claim. *Jensen*, 696 N.W.2d at 588; *Sain*, 626 N.W.2d at 125 (although the tort had been recognized in the context of financial or commercial transactions, holding that "the business or commercial requirement for the tort does not actually concern the subject matter of the transaction between the plaintiff and the defendant, but requires the defendant to be in the business or profession of supplying information for the guidance of others. This is the fundamental requirement to support the imposition of a duty, which is essential for all negligence claims."); *Greatbatch v. Metropolitan Federal Bank*, 534 N.W.2d 115, 117 (Iowa Ct. App. 1995) (also recognizing that "the duty to use reasonable care in supplying information applies only to persons engaged in the business or profession of supplying information to others").

Similarly, the Iowa Court of Appeals has observed that "[n]o clear guideline exists to define whether a party is in the business of supplying information." *Greatbatch*, 534 N.W.2d at 117.

> On one hand, manufacturers and dealers of merchandise have
> not generally been considered to be in the business of
> supplying information. Their businesses involve making,
> selling and servicing products, and any information provided

> during the course of the business is incidental. Similarly,
> sellers of a business are not themselves in the business of
> supplying information. On the other hand, the duty has been
> readily applied to accountants and investment brokers. These
> professions directly involve the supply of information.

*Greatbatch*, 534 N.W.2d at 117 (citations and footnote omitted); *accord Sain*, 626 N.W.2d at 126 (when the tort was recognized in *Ryan*, 170 N.W.2d 402, the court had "indicated the tort applies not only to accountants, but logically can be extended to other professional purveyors of information"); *Fry*, 554 N.W.2d at 266 (quoting this summary from *Greatbatch*). In addition, the court noted that Iowa decisions had distinguished cases where information is supplied as "part of the overall product," and the defendant was thus "in the business of supplying information," from cases in which the information was merely "incidental to the underlying . . . transaction," and the defendant, therefore, was not subject to a negligent misrepresentation claim. *Id.* at 118.

Finally, the court, not the jury, decides whether defendants were "in the business of supplying information" as a matter of law, in light of the facts, because the defendants' duty is always a matter for the court to decide. *See, e.g., Fry*, 554 N.W.2d at 265 (in a negligent misrepresentation case, the court wrote, "Whether such a duty exists is always a question of law for the court."); *Greatbatch*, 534 N.W.2d at 116 (in a negligent misrepresentation case, the court wrote, "Whether a duty exists to impose an obligation on a defendant to conform to a standard of care for the benefit of the plaintiff is an issue of law for courts to resolve").

### b.    *Did SunSource have the necessary duty?*

Here, the court concludes, as a matter of law, that SunSource was not under the kind of "duty," *i.e.*, Sunsource did not have the sort of "special relationship" with Conveyor, that would support a claim of negligent misrepresentation. *See, e.g., Fry*, 554 N.W.2d at 265 ("Whether such a duty exists is always a question of law for the court."). This is so, because SunSource simply was not "in the business or profession of supplying information to others." *Sain*, 626 N.W.2d at 124.

More specifically, contrary to Conveyor's contentions, the record shows that SunSource was not "act[ing] in an advisory capacity," even if it was "manifestly aware of the use" to which the hydraulic lift package would be put, and intended to supply the hydraulic lift package for that purpose. *Id.* at 124-25. What SunSource provided was not *information* about hydraulic lift packages or flow dividers, but a hydraulic lift package intended to meet Conveyor's specifications. SunSource was presented with certain specifications for the hydraulic lift package, and provided a product that ostensibly met those specifications; SunSource was not in the position of providing *information*, or in the position of weighing the use for the *information* against the magnitude and probability of loss that might attend the use of the information if it was incorrect. *Compare id.* at 125 (it is the defendant's provision of *information*, rather than a product, that invokes the necessary duty). Under these circumstances, SunSource's pecuniary interest in its business of selling hydraulic lift packages simply does not create the sort of duty that would sustain a negligent misrepresentation claim. *Compare id.* (pecuniary interest in the business is an additional basis for imposing a duty of care). Information about the flow divider was given "gratuitously or incidental to a different service," the provision of a hydraulic lift package meeting the contract specifications, so that service did not impose the necessary duty. *Id.* In other words, what was involved here was "an arms-length and adversarial

transaction" in which SunSource quoted the price for and then provided a product meeting Conveyor's specifications. *See Jensen*, 696 N.W.2d at 588 (such a relationship will not sustain a negligent misrepresentation claim).

To put it another way, SunSource was not a "professional purveyor of information," *see id.* at 126, such as an accountant or investment broker. *Greatbatch*, 534 N.W.2d at 117. Nor can it reasonably be said that SunSource provided information about the necessary requirements for an adequate hydraulic lift package as "part of the overall product." *Id.* at 118. Rather, SunSource acted as a manufacturer or dealer of merchandise, whose business involved making and selling products, among them hydraulic lift packages, and any information SunSource provided during the course of that business was merely "incidental to the underlying . . . transaction" involving the sale of a hydraulic lift package. *Id.*

Therefore, SunSource is entitled to summary judgment on Conveyor's negligent misrepresentation claim on the ground that, as a matter of law, SunSource was not under the sort of "duty" on which such a claim must be based. Because the court finds that SunSource did not have the necessary "duty," the court finds it unnecessary to consider whether or not there are genuine issues of material fact on other challenged elements of Conveyor's negligent misrepresentation claim.

## III. CONCLUSION

It is entirely possible that, had Conveyor been informed of the possible variance with the flow divider that SunSource had selected for the hydraulic lift package for the Singer Stacker (and SunSource contends that it did so inform Conveyor, which Conveyor disputes), or if, on the other hand, SunSource had been informed that the only component in the Stinger Stacker that would maintain the synchronization between the hydraulic

cylinders was the flow divider, after that design change was made (and Conveyor contends that it did so inform SunSource, which SunSource disputes), one party or the other might have recognized that the hydraulic lift package provided by SunSource would not satisfy the specific design requirements of the Stinger Stacker. Certainly, neither party recognized that problem, and each party blames the other. Nevertheless, wherever the breakdown in communication occurred, the claim arising from the breakdown is *not* a tort claim for strict products liability or negligent misrepresentation; it is, at best, a contract or warranty claim, and more specifically, a claim of breach of implied warranty of fitness for a particular purpose, a claim of breach of implied warranty of fitness for ordinary purposes (merchantability), or a claim of breach of contract. This matter will proceed to trial only on these claims.

THEREFORE, for the reasons stated herein, defendant SunSource's August 10, 2005, Motion For Partial Summary Judgment (docket no. 47), seeking summary judgment in its favor on Counts II, III, and IV of Conveyor's Complaint, is **granted in part and denied in part**, as follows:

1.      The motion is **denied** as to Conveyor's claim of breach of implied warranty of merchantability in Count II;

2.      The motion is **granted** as to Conveyor's claim of strict products liability in Count III; and

3.      The motion is **granted** as to Conveyor's claim of negligent misrepresentation in Count IV.

Consequently, this matter will proceed to trial on Counts I (breach of implied warranty of fitness for a particular purpose), II (breach of implied warranty of merchantability), and V (breach of contract) of Conveyor's Complaint.

**IT IS SO ORDERED.**

**DATED** this 2nd day of November, 2005.

_Mark W. Bennett_
_____
MARK W. BENNETT
CHIEF JUDGE, U. S. DISTRICT COURT
NORTHERN DISTRICT OF IOWA